**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
)
**David V. Mann,**                                    )
                                                    )
    **Plaintiff,**                                   )
                                                    )
        **v.**                                       )        **Civil No. 13-cv-00120 (APM)**
                                                    )
**Washington Metropolitan Area Transit**              )
**Authority (WMATA),**                                )
                                                    )
    **Defendant.**                                   )
_____)

## <u>MEMORANDUM OPINION</u>

## I.    INTRODUCTION

Plaintiff David V. Mann filed this lawsuit against his former employer, Defendant Washington Metropolitan Area Transit Authority (WMATA), alleging that he was unlawfully terminated on the basis of race in violation of Title VII of the Civil Rights Act of 1964. WMATA argues that it is entitled to summary judgment because Mann, a Lieutenant with WMATA's police department at the time of his termination, was fired for a legitimate reason: he had used excessive and unnecessary force while making an arrest. Mann repeatedly punched an arrestee while he was lying on the ground and dropped him from knee height multiple times. The arrestee suffered facial lacerations, rib fractures, and a lumbar spine fracture.

Mann contends that summary judgment should be denied because a reasonable jury could find that WMATA treated other similarly situated officers of a different race more favorably than him. Having reviewed the evidence, which includes a video of the arrest, the court holds that no reasonable jury could conclude that WMATA's stated reason for terminating Mann was a pretext

and that the actual reason for his firing was his race.   The court therefore grants Defendant's Motion for Summary Judgment.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The Arrest

Plaintiff David Mann began working for Defendant WMATA's Metropolitan Transit Police Department (MTPD) in 1990 as a Special Police Officer, a non-law enforcement position. Def.'s Mot. for Summ. J., ECF No. 34 [hereinafter Def.'s Mot.], Statement of Material Facts Not in Dispute, ECF No. 34 [hereinafter Def.'s Statement], ¶ 6; Pl.'s Opp'n to Summ. J., ECF No. 38 [hereinafter Pl.'s Opp'n], Statement of Disputed Material Facts, ECF No. 38 [hereinafter Pl.'s Statement], ¶¶ 6-8.   After two and a half years, Plaintiff was selected to become a MTPD police officer.   Def.'s Statement, ¶¶ 7-8; Pl.'s Statement, ¶¶ 6-8.   He attended the police academy, qualified as a sworn Transit Police Officer, and rose through the ranks of MTPD to the position of Lieutenant.   Def.'s Statement, ¶¶ 8, 10-11; Pl.'s Statement, ¶¶ 6-8.

The incident that led to Mann's firing occurred on September 2, 2011.   As recounted by Mann himself, at approximately 9:30 p.m., he responded to a call from MTPD Communications indicating that a disorderly male was throwing rocks at a special police booth located at the Southern Avenue Bus Annex in Prince George's County.   Def.'s Mot., Ex., Mem. from Lieutenant David V. Mann to Captain Kevin P. Gaddis [hereinafter Mann Mem.], ECF No. 34-9, at 1.   When Mann arrived there, he saw seven to nine WMATA employees standing around the suspect, John Dowtin, who was lying on the ground.   *Id.*   The WMATA employees informed Mann that Dowtin had been throwing rocks at Special Police Officer Nakisha Merritt while she was in the Special Police Officer's booth and that he also had broken the window of a bus operator's vehicle with a

rock. *Id.* Mann also noticed another person nearby, Thomas McDonald, a Metro bus operator, who looked disheveled and appeared to be bleeding from a cut from his head. According to McDonald, Dowtin had asked him for money and, when he refused, Dowtin assaulted him. The two then got into a fight, which ended only after five employees intervened. *Id.* Mann then notified MTPD Communications that he intended to arrest Dowtin for attempted robbery and destruction of property. *Id.*

Mann then approached Dowtin, who was lying on the ground. *Id.* Mann asked him for identification, and Dowtin complied. *Id.* He then asked Dowtin if he was okay. *Id.* at 2. Dowtin replied, "'no, they beat my ass,'" and began cursing. *Id.* at 2. Dowtin sat up, and Mann asked him to get back on the ground. *Id.* Dowtin refused several times, continuing to curse at Mann. In response, Mann "pull[ed]/pushed" Dowtin to the ground, where Dowtin remained while Mann interviewed Officer Merritt. *Id.* While Mann interviewed Officer Merritt, Dowtin sat up again, began cursing, took off his shoes, and threw them into the street. *Id.* After Mann completed his interview of Officer Merritt, he asked Dowtin for his social security number. *Id.* Dowtin responded that he did not have a social security number and continued cursing. *Id.* While awaiting backup, Mann turned his attention to McDonald to obtain more information about the attempted robbery and assault. *Id.* While Mann was speaking with McDonald, Dowtin became louder, "shouting profanities and [behaving] erratic[ly]." *Id.* He took his socks off and threw them into the street. *Id.*

Concerned that Dowtin would become "more problematic and violent," Mann advised him that he was under arrest and attempted to handcuff him. *Id.* Dowtin resisted, despite Mann's repeated orders to "give me his hands." *Id.* To restrain Dowtin, Mann first used pain compliance tactics by "bending and torqueing" Dowtin's arm behind his back and by bending his hand at the

wrist, but Dowtin still failed to comply, breaking free of Mann's grasp.  *Id.*  Mann then radioed for backup while continuing, unsuccessfully, to gain control of Dowtin's hands.  *Id.*  Trying a different approach, Mann began striking Dowtin in the ribs "several times" and, when that did not work, he used his "O/C spray," or pepper spray.  *Id.*  After determining that the O/C spray had no effect, Mann again "began to strike . . . [Dowtin] in the ribs repeatedly with the verbal demand '[g]ive me your hands' in a loud and clear voice, prior to and after each strike; however Mr. Dowtin refused to comply and the strikes seemed to have no effect."  *Id.*

In a final effort to get Dowtin to release his hands from underneath his body, Mann lifted Dowtin "up off the ground about knee high in height and dropped him in an effort to daze/stun him, knock the wind out of him or get him to spread his arms out to brace/catch his fall."  *Id.*  This enabled Mann to gain control of Dowtin's right arm, but he was still unable to handcuff him.  *Id.*  Mann again struck Dowtin "in the sides of his body with no success."  He lifted Dowtin "off the ground two (2) more times and dropped him, looking for the same results as the first time."  *Id.*  After a brief struggle, Mann managed to handcuff Dowtin, at which point "all use of force ceased."  *Id.*  Following the arrest, Dowtin was taken to a hospital and was diagnosed with multiple facial lacerations, multiple rib fractures, and a lumbar spine fracture.   Def.'s Statement, ¶ 23; Pl.'s Statement, ¶ 23.

Two days later, on September 4, 2011, Mann's weapon and police powers were taken away, and he was restricted to administrative duties.  Compl., ECF No. 1, ¶ 18.

>  2.   *The MTPD Investigation*

>>  a.   <u>Gaddis' investigation</u>

In September 2011, Captain Kevin Gaddis (now Deputy Chief Gaddis) was the Commander of MTPD's Office of Professional Responsibility and Investigation (OPRI) and

reported directly to MTPD's Police Chief, who at the time was Michael Taborn.  Def.'s Statement, ¶¶ 13, 18, 20; Pl.'s Statement, ¶ 13-16, 18, 20.  Taborn directed Gaddis to investigate Mann's arrest of Dowtin.  Def.'s Statement, ¶ 22; Pl.'s Statement, ¶ 22.

On September 5, 2011, just as Gaddis was starting his investigation, MTPD received a call from a concerned citizen, who said that she knew someone who had cell phone video footage of Mann's arrest of Dowtin.  Def.'s Mot., Ex., Mem. from Captain Kevin P. Gaddis to Chief Michael A. Taborn, ECF No. 34-4 [hereinafter Mann Investigation Rep.] at 3.  That same day, Captain Gaddis and an MTPD video technician retrieved a copy of the video.  Def.'s Statement, ¶ 25; Pl.'s Statement, ¶ 25.  Gaddis also interviewed the person who recorded the arrest, but was unable to obtain a written statement from him.  Mann Investigation Rep. at 3.

After reviewing the video footage, Gaddis took numerous additional investigative steps, which included eliciting evidence from eyewitnesses and from Mann himself.

- On September 6, 2011, Gaddis obtained a written statement from MTPD Special Police Officer Nakisha Merritt, who had called the MTPD after observing Dowtin break a car window.  Mann Investigation Rep. at 3-4; Pl.'s Opp'n, Ex. 14, ECF 38-14.

- On September 9, 2011, Gaddis visited the Southern Avenue Bus Annex to interview additional witnesses.  Mann Investigation Rep. at 4.  He interviewed and obtained a written statement from Metro bus operator Thomas McDonald, whom Dowtin had assaulted and had attempted to rob.  *Id.* at 5; Pl.'s Opp'n, Ex. 10, ECF No. 38-10.  Captain Gaddis also attempted to interview other Metro employees, but they either

refused to cooperate or claimed to have not seen anything.  Mann Investigation Report
at 5.

- Later, Gaddis obtained written statements from three MTPD officers—Sergeant K.
  Honick, Officer Colin Jackson, and Lieutenant Robert Kirkpatrick—all of whom had
  arrived after Mann had handcuffed Dowtin.  Pl.'s Opp., Exs. 11, 9, 12, ECF Nos. 38-
  11, 38-9, 38-12.

On September 19, 2011, Gaddis met with the State's Attorney for Prince George's County.
Mann Investigation Rep. at 7.  The purpose of the meeting was to find out whether the State's
Attorney intended to prosecute Mann.  *Id.*  In an affidavit submitted during discovery, Gaddis
explained that sometimes MPTD will delay performing a full internal disciplinary investigation if
it might interfere with an ongoing criminal investigation.  Pl.'s Opp'n, Ex. 27, Aff. of Deputy
Chief Kevin Gaddis, ECF No. 38-27 [hereinafter Gaddis Aff.], ¶ 5.  Gaddis further attested,
however, that if MPTD has sufficient information to make a disciplinary decision, it will not await
the conclusion of the criminal prosecution to impose discipline.  *Id.* ¶ 6.  In this case, after the
State's Attorney reviewed the video, it informed Gaddis that its criminal investigation of Mann's
conduct would proceed, but that MPTD's investigation could continue without interfering with the
criminal case.  Def.'s Statement, ¶¶ 29-30; Pl.'s Statement, ¶¶ 29-30.

Then, on October 20, 2011, Gaddis conducted a formal interview of Plaintiff, which was
transcribed.  Pl.'s Opp'n, Ex. 4, Interview of Lieutenant David Mann, ECF No. 38-4 [hereinafter
Mann Interview].  Before the interview commenced, Mann provided Gaddis with a three-page
memorandum, dated September 8, 2011, which described Mann's version of events and provided
an explanation for his use of force.  Mann Investigation Rep. at 8; Pl.'s Opp'n, Ex. 5, ECF No. 38-
5.  Also, before the interview began, Gaddis showed Mann the video footage of Dowtin's arrest.

Mann Interview at 3:11-15.  Mann then proceeded to explain the nature and extent of the force he had used to arrest Dowtin.  *See generally* Mann Interview.

The final step of Gaddis' investigation involved consulting with a use-of-force expert. On October 26, 2011, Gaddis met with Captain Rudolph Dawson, Commander of the MTPD Training Academy.  Dawson also had served as the Assistant Director of the Northern Virginia Regional Training Academy for three years.  Mann Investigation Rep. at 9.  Gaddis provided Dawson with a copy of the video of Dowtin's arrest and a copy of Mann's transcribed interview. *Id.*  After reviewing those materials, Dawson concluded, in a written memorandum, that "Mann's actions were not in compliance with the defensive tactics taught by the Northern Virginia Criminal Justice Training Academy, the [Metropolitan Transit Police Academy], or those addressed in General Order #130, Use of Force."  Def.'s Mot., Ex., Mem. from Captain Randolph Dawson to Captain Kevin Gaddis, ECF No. 34-11 [hereinafter Dawson Mem.], at 1.  Dawson further opined that, because Dowtin had made no attempt to strike Mann or flee from him, Dowtin "displayed the characteristics of a passive or low level resister"; therefore, "the amount of force used to effect the arrest appeared to be unnecessary and excessive."  *Id.*

> b.    Gaddis' findings and recommendation and Taborn's review

At the conclusion of the investigation, Gaddis produced to Chief Taborn an eleven-page report, dated November 14, 2011, plus extensive attachments, in which he recommended that Mann be terminated.  *See generally* Mann Investigation Rep.  Gaddis found that Mann's use of force was "excessive and unnecessary to affect the arrest of Mr. Dowtin."  *Id.* at 10.  "Mann did not need to beat Dowtin into submission to gain control of him.  The Department did not train Mann in the techniques he used," Gaddis concluded.  *Id.*  Gaddis determined that Mann's actions

had violated WMATA General Order No. 130[1] and General Order No. 217,[2] which address the appropriate use of force by officers.  *Id.*  Gaddis also determined that Mann had violated the Metro Transit Police Oath of Office,[3] finding that "Mann's actions of brutality brought discredit to the department.  His actions violated the special trust placed in him as a member of the Metro Transit Police Department."  *Id.* at 11.

Upon reviewing Gaddis' report, Chief Taborn determined that the investigation supported Gaddis' findings and conclusions, as well as his recommendation to terminate Plaintiff.  Def.'s Statement, ¶ 47.  But before taking action against Mann, Taborn asked all of his command staff, consisting of six deputy chiefs, to make their own assessments of Dowtin's arrest and to weigh in on the appropriate discipline.  *Id.* ¶¶ 45-46.  According to Taborn, because Plaintiff was a high-ranking MTPD official, he wanted to ensure that the investigation was thorough and that "no stone [was left] unturned."  *Id.* ¶ 49.  Each of Taborn's six deputy chiefs watched the video of Dowtin's arrest and read a version of Gaddis' report with the conclusions and recommendations redacted. *Id.* ¶¶ 44-45.  The command staff unanimously agreed that Plaintiff should be terminated.  *Id.* ¶ 49. On November 18, 2011, Gaddis discharged Mann for use of excessive force.  Compl. ¶ 19.[4]

c.    Is    State criminal proceedings against Mann

Nearly a year later, on September 4, 2012, the State of Maryland indicted Mann for Assault in the First Degree, Assault in the Second Degree, Reckless Endangerment, and Misconduct in

---

[1] General Order No. 130 provides that, "[m]embers will use the amount of force necessary to effect an arrest, overcome resistance, or protect themselves and/or others from harm.  Use of force must be justified.  Unnecessary force is prohibited."  Mann Investigation Rep. at 10.

[2] General Order No. 217 provides that "[m]embers will not employ unnecessary force or violence or engage in cruel, degrading or inhuman treatment of any person."  Mann Investigation Rep. at 10.

[3] The Metro Transit Police Oath of Office provides, in relevant part, "I accept the police credential and shield as being representative of the special trust placed in me as a Metro Transit Police Officer."  Mann Investigation Rep. at 11.

[4] Plaintiff disputes the facts set forth in the above paragraph based on the assertion that both the full and redacted reports prepared by Gaddis contain "a selective presentation of the facts that did not present a full picture of the facts and circumstances in which Lt. Mann made the decision to use force."  Pl.'s Statement ¶ 47; *see also id.* ¶¶ 44-46, and

Office.  *Id.* ¶ 22.  The case went to trial in October 2013, whereupon Mann was acquitted.

Pl.'s Opp'n, Ex. 7, Trial Tr., ECF No. 38-7.  WMATA did not reinstate Mann after his acquittal.

### B.     Procedural History

On November 28, 2011, Mann filed a Charge of Discrimination on the basis of race with

the D.C. Office of Human Rights and the Equal Employment Opportunity Commission.

Compl. ¶ 21.  On November 5, 2012, he received a Notice of Right to Sue from the Employment

Litigation Section of the Department of Justice.  *Id.* ¶ 24.

Plaintiff filed suit in this court on January 29, 2013, alleging discrimination in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* [hereinafter Title VII]

(Count I); the Civil Rights Act of 1866 and 1870, as amended, 42 U.S.C. § 1981 (Count II); and

the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401.01 *et seq* (Count III).

*See generally* Compl.  On May 5, 2013, Plaintiff voluntarily dismissed Counts II and III of his

Complaint.  *See* Notice of Dismissal, ECF No. 5.  Thus, the only count before the court is for

discrimination based on race in violation of Title VII.  *See id.*; Compl.

In his Complaint, Plaintiff presented nine disciplinary incidents involving officers "not of

Plaintiff's race and color."  Compl. ¶ 28.  Plaintiff alleged that those nine incidents demonstrate

that he was terminated on account of his race because, in each, WMATA treated the "comparators"

less harshly than it treated him, even though they had engaged in similar behavior.  *Id.*

Following discovery, on March 30, 2015, Defendant filed a Motion for Summary Judgment

in which it argued that WMATA had legitimate, non-discriminatory reasons for terminating

Plaintiff and had not fired him on the basis of his race.  *See generally* Def.'s Mot.  On May 15,

---

¶¶ 49-50.  However, Plaintiff does not dispute that Taborn himself concluded that Plaintiff had used excessive force; that Taborn sought counsel from his deputy chiefs about Mann's actions; or that the deputy chiefs unanimously agreed that Plaintiff's conduct warranted his termination.  *See id.* at ¶¶ 44-47, ¶¶ 49-50.

2015, Plaintiff filed his Opposition to Defendant's Motion for Summary Judgment, claiming that there exists a genuine dispute of material fact as to four issues: (1) whether the force used by Mann while arresting Dowtin was excessive; (2) whether the comparators named by Mann were similarly situated to him; (3) whether Defendant discriminated against him by failing to halt his OPRI investigation while criminal charges were pending and by failing to reconsider his firing after he was acquitted; and (4) whether Gaddis' investigation report was biased, omitted key facts, and led Taborn to the mistaken conclusion that Mann should be terminated. *See generally*, Pl.'s Opp'n.

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure Rule 56 provides that a court should grant summary judgment if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(a)). A material fact is one that is capable of affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, [ ] on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and identifying those portions of the record that it believes "demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

Once the moving party has made an adequate showing that a fact cannot be disputed, the burden shifts to the party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (citation and internal quotation marks omitted) (footnote omitted). The nonmoving party may oppose the motion using "any of the kinds

of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which [the Court has] referred." *Celotex Corp.*, 477 U.S. at 324. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citations omitted). However, "to defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) (citing *Celotex*, 477 U.S. at 324).

## IV.    DISCUSSION

Under Title VII, an employer may not "discharge any individual, or otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In the absence of direct evidence of discrimination, Title VII claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006). The plaintiff bears the burden of proving a *prima facie* case of discrimination; if he does so, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action; the plaintiff then must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citation and internal quotation marks omitted).

Once an employer sets forth a legitimate, non-discriminatory reason for the employment action, however, "the question whether the employee actually made out a *prima facie* case is no longer relevant, and thus disappears and drops out of the picture." *Brady v. Office of Sergeant at*

*Arms*, 520 F.3d 490, 493-94 (D.C. Cir. 2008) (citations and internal quotation marks omitted). When evaluating an employer's motion for summary judgment in such circumstances, the key question for the court to resolve is whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race" or some other prohibited ground. *Id.* at 494 (citations omitted). "At this point, to survive summary judgment the plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment decision was made for a discriminatory reason." *Mastro*, 447 F.3d at 855 (citations and internal quotation marks omitted).

Here, Defendant has asserted a non-discriminatory reason for Plaintiff's termination:  his excessive use of force in arresting Dowtin violated MTPD's policies and the Metro Transit Police Oath of Office.  Thus, the question whether Plaintiff made out a *prima facie* case is no longer relevant, and the court turns directly to the issue of whether Mann produced evidence sufficient— under a preponderance of the evidence standard—for a reasonable jury to find that WMATA's stated reason was not the actual reason for his termination and that the true reason was his race. *See Brady*, 520 F.3d at 495; *see also Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1154 (D.C. Cir. 2004) ("[O]nce the defendant has responded with rebuttal evidence, the factfinder normally proceeds to the ultimate issue on the merits to determine whether the employer intentionally discriminated against the plaintiff.").

A.    **The Reasonableness of Defendant's Conclusion that Plaintiff Had Used Excessive Force**

Plaintiff contends that the court should deny summary judgment because there is a "legitimate, genuine dispute of material fact" as to whether "the force he utilized on Sept. 2, 2011 was excessive."  *See* Pl.'s Opp'n at 12.  In support of that argument, Plaintiff relies heavily on an

expert opinion provided by Shannon Bohrer, a law enforcement professional who testified at Mann's criminal trial, at which he was acquitted.  *See id.*  According to Plaintiff, WMATA did not "weigh reasonableness under the circumstances" when determining whether Mann's use of force was excessive.  The fact that Bohrer will testify that his use of force was reasonable creates a genuine dispute of material fact.  *Id.* at 15.

Whether Mann's use of force was excessive is not an issue of material fact, however.  As the Court of Appeals has made clear, "[o]nce the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers."  *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citations and internal quotation marks omitted).  In other words, "[a]n employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false."  *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005) (citation and internal quotation marks omitted).  "If the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts."  *Brady*, 520 F.3d at 495 (citations omitted).  The question in this case, then, is not whether Plaintiff's use of force was excessive, but rather, whether Defendant honestly believed that his use of force was excessive.  *See id.*

No reasonable jury could conclude that Defendant did not honestly believe that Plaintiff's use of force was excessive.  Plaintiff offers no facts to contradict Taborn's honestly held belief that Mann had used excessive force in arresting Dowtin.  Def.'s Mot., Ex., Dep. of Michael Alan Taborn, ECF No. 34-7 [hereinafter Taborn Dep.], 5:13-22 (explaining that he fired Mann "[b]ecause of his conduct that was unbecoming that of a police officer in this particular case that

involved use of force").  Instead, Plaintiff claims that "Chief Taborn's conclusion was based on a selective presentation of the facts that did not present a full picture of the facts and circumstances in which Lt. Mann made the decision to use force."  Pl.'s Statement ¶ 50.  But even if that were so, Chief Taborn's reliance on "a selective presentation of the facts" does not negate his belief—based on the evidence that he reviewed—that Mann's termination was for a non-race-based reason.

In any event, the evidence presented amply supports Taborn's testimony that he terminated Mann for a legitimate, non-raced-based reason.  Not only did he independently review and evaluate Gaddis' findings and recommendation, Taborn Depo. at 7:20-8:6, he also relied on the unanimous opinion of his six deputy chiefs that Mann should be terminated, *id.* at 6:5-8:17.  As Taborn explained, he asked his deputy chiefs to review the evidence against Mann—which was not required by MTPD policy and which he previously had not done before—because Mann was a "high-ranking official" and he "wanted to ensure that there was no stone unturned as relates to what was depicted in the investigation or the video."  *Id.* at 9:1-19.  Mann offers nothing to rebut Taborn's honest belief that Mann had used excessive force.  Accordingly, there is no genuine dispute of material fact that Defendant "honestly believe[d]" the non-discriminatory reason it has offered for Mann's termination.  *See Brady*, 520 F.3d at 495 ("The question is not whether the underlying [incident warranting termination] occurred; rather, the issue is whether *the employer honestly and reasonably believed* that the underlying [incident warranting termination] occurred." (citations omitted)).

### B.      Whether the Comparators are Similarly Situated

Next, Plaintiff asserts that there is a genuine dispute of material fact as to whether his race was the true reason for his termination because he was treated more harshly compared to other similarly situated employees who are not African American.  Plaintiff identifies a number of non-

African American MTPD officers—F.P., D.B., Y.C., I.B., C.C., R.O., and A.V.—who he claims committed offenses of "comparable seriousness" and were disciplined or investigated by Defendant, but who were not terminated from their positions.  *See* Pl.'s Opp'n at 25-26; *see also* Pl.'s Statement ¶¶ 62-63, 65.  Having reviewed the evidence, the court finds that none of the officers identified by Plaintiff is an appropriate comparator.

"One way to discredit an employer's justification is to show that similarly situated employees of a different race received more favorable treatment."  *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008).  "For a plaintiff to prove that she is similarly situated to another employee, she must demonstrate that she and the alleged similarly-situated employee 'were charged with offenses of comparable seriousness,' and 'that all of the relevant aspects of her employment situation were nearly identical to those of the other employee.'"  *Wheeler v. Georgetown Univ. Hosp.*, -- F.3d --, 2016 WL 556705 (D.C. Cir. Feb. 12, 2016) (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (alteration omitted)).  "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses."  *Id.* (quoting *Burley*, 801 F.3d at 301) (internal quotation marks omitted).

### 1.    Rank and job responsibilities

Before turning to the specific comparators, the court addresses Defendant's argument that none are similarly situated to Mann because, unlike Mann, who was a high-ranking official at the time of the incident, they "are all officers, not officials of any rank[,] save one, whose rank is Sergeant."  Def.'s Mem. at 5.  This distinction is significant, according to Defendant, because "[o]fficers' discipline is governed by the labor process collective bargaining agreement, unlike the

15

discipline of officials, so the process of discipline is completely different in terms of process and discipline." *Id.* at 12. Defendant is correct as a factual matter that none of the comparators are as high a ranking official as Plaintiff. But, in this case, that fact alone does not automatically disqualify them as proposed comparators.

The Court of Appeals has repeatedly held that persons of different ranks might not be proper comparators even if they engage in comparable misconduct. In *McKenna v. Weinberger*, 729 F.2d 783, 789-90 (D.C. Cir. 1984), the Court of Appeals held that permanent and probationary employees were not similarly situated, noting that "agency regulations mandated that probationary employees with serious performance problems were to be terminated, even if those problems would not have been good cause for terminating a permanent employee." (footnote omitted). Similarly, in *Holbrook v. Reno*, 196 F.3d 255 (D.C. Cir. 1999), the Court of Appeals held that a probationary trainee was not similarly situated to a supervisor with whom she engaged in an improper relationship, even though both were disciplined for similar offenses. *Id.* at 262-63; *see also Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (holding that two law firm associates were not similarly situated, in part, because the comparator was less senior than the plaintiff, "thus, the partners weren't as pressed to make a decision regarding his partnership prospects as they were with" the plaintiff).

However, just because two employees occupy different positions does not automatically render a comparison between them inappropriate. Plaintiff cites to *Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012), for the proposition that "when comparators of different ranks are disciplined for 'violating a general workplace rule that applied to employees in all departments and of all ranks . . . comparisons between employees with different positions are more likely to be useful." Pl.'s Opp'n at 24 (quoting *Coleman*, 667 F.3d at 849). Recently, the Court of Appeals embraced that

principle in *Burley v. National Railroad Corp. See* 801 F.3d at 301-02.  There, the plaintiff, relying

on *Coleman v. Donahoe*, argued that comparisons between employees with different positions are

more apt in cases involving violations of general workplace rules.  *Id.*  The Court of Appeals

agreed with that assertion:  "Burley contends that the mere fact that two employees had different

titles and duties does not necessarily undermine the probative value of their different treatment.

Burley is, as a general matter, correct."  *Id.* at 301.  The Court ultimately concluded, however, that

the other employee was an unsuitable comparator because he and Burley had different job

responsibilities.  *Id.*

Here, it is undisputed that Mann, as a high ranking official, is differently situated from

MTPD officers, because their collective bargaining agreement permits them to appeal employment

decisions through their union.  Pl.'s Opp'n, Ex. 8, Dep. of Captain Kevin Patrick Gaddis, ECF No.

38-8 [hereinafter Gaddis Dep.], at 44:12-45:15; Pl.'s Opp'n, Ex. 1, Dep. of David Mann, ECF No.

38-1 [hereinafter Mann Dep.], at 135:20-136:18.  Yet Chief Taborn conceded that MTPD's "use

of force protocol" was applicable to *all* law enforcement officers, regardless of rank.  Taborn Dep.

10:22-11:17.  Thus, while Plaintiff's status as a higher-ranking, at-will employee—as distinct from

an officer who enjoys the protections of a collectively bargained disciplinary process—should be

given some weight when determining the suitability of a comparator, it is neither dispositive nor

automatically disqualifying in this case.

### 2.      *Officers I.B., C.C., and R.C.*

The court now turns to the specific comparators.  Plaintiff claims that Officers I.B., C.C.,

and R.O.—two Caucasians and one African American[5]—received more favorable treatment than

---

[5] Ordinarily, the African American officer would be not be considered a comparator, as he and Plaintiff are of the same race.  The court nevertheless includes him as a comparator as he was disciplined alongside two Caucasian officers who were involved in the same incident.

him.  Despite being investigated "for pushing a WMATA patron out of her wheelchair and on to the ground," one officer received a written warning and the other two received five day suspensions.  Pl.'s Statement ¶ 62; Pl.'s Opp'n., Ex. 20, ECF No. 38-20, at 4.  But these officers are not apt comparators because they did not engage in offenses of "comparable seriousness." *Wheeler*, 2016 WL 556705, at *7 (citation and internal quotation marks omitted).  Two of the officers, C.C. and R.O., were found to have improperly dragged the patron along the ground after she fell out of a wheelchair.  Pl.'s Opp'n, Ex. 20 at 4.  They were not found to have pushed the patron out of her wheelchair—the patron herself complained only that she "fell out of her wheelchair while it was being pushed by the officers." *Id.* at 2.  Nor were they accused of or found to have used excessive force.  The reprimand that the third officer, I.B., received, was for not properly securing and returning the wheelchair to the patron.  *Id.* at 2.  Accordingly, these officers are not suitable comparators.

### 3.    *Officers F.P. and D.B.*

Next, Plaintiff names as comparators F.P. and D.B., Caucasian officers who were investigated for "slamming a man in a wheelchair to the ground" while making an arrest.  Pl.'s Statement ¶ 62.   But these officers also did not engage in "comparable offenses"; indeed, according to the investigation, they engaged in no offenses at all.  Pl.'s Opp'n, Ex. 13, ECF No. 38-13, at 4.   The investigation conducted by Gaddis—which, like Plaintiff's investigation, involved interviews of the officers, the arrestee, and bystander witnesses, as well as review of a video of the arrest—found that the officers had *not* used excessive force.  *Id.* at 3-4.  The arrestee, unlike Dowtin, actually struck one of the officers.  Then, when the arrestee attempted to rise from the wheelchair, he fell to the ground on his own, along with the two officers.  *Id.* at 4.  The officers did not use any force after the arrestee had fallen to the ground.  *Id.*  Unlike in Plaintiff's case, the

investigation "vindicate[ed]" the actions of Officers F.P. and D.B. *Id.* at 3. F.P. and D.B. therefore are not similarly situated to Plaintiff.

### 4. Officer A.V.

Officer A.V. likewise is not a proper comparator because he, too, did not engage in an offense of comparable seriousness. According to Plaintiff, Officer A.V.—an Asian American— was investigated for "slamming a woman to the ground, lying on top of her, and exposing her undergarments and private areas while attempting to handcuff her." Pl.'s Statement ¶ 62. But a video taken of the arrest showed that the officer used proper techniques in making the arrest and did not use excessive force. Pl.'s Opp'n, Ex. 17, ECF No. 38-17 at 1. The investigation report— written by Gaddis and approved by Taborn—described the video as showing that the suspect, upon Officer A.V.'s attempt to stop her, "pushe[d] away from him, and it appears on the video he takes her to the ground." *Id.* at 1. Then, when attempting to handcuff her, Officer A.V. was "on top of" her and gave her "clear verbal commands to stop resisting." *Id.* The video does not show A.V. punching or dropping the arrestee to make the arrest. Gaddis concluded that A.V. "acted lawfully and complied with the MTPD policies and procedures." *Id.* at 2. No disciplinary measures were recommended, and no complaints were received regarding the incident. *Id.* at 1-2. Because A.V. was not found to have committed any offense at all—let alone, an offense of "comparable seriousness," *Burley*, 801 F.3d at 302—Officer A.V. cannot be used as a comparator.

### 5. Officer Y.C.

The final proposed comparator, Officer Y.C., warrants more extended discussion. Unlike the others, Y.C., like Plaintiff, actually was found to have violated the General Order prohibiting the unreasonable use of force; yet, he received only a three-day suspension. Pl.'s Opp'n, Ex. 18, ECF No. 38-18 at 3-4. Y.C. admitted that he twice kicked an arrestee in the head while the arrestee

was on the ground wrestling with the other officers.  Y.C. also admitted that "the [arrestee]…did not present enough of a threat to justify being kicked in the head."  *Id.* at 2.  In comparing Y.C. to Plaintiff, the court is mindful "that determining whether two employees are similarly situated is ordinarily a question of fact for the jury."  *Wheeler*, 2016 WL 556705, at *5.  Nevertheless, after carefully considering and weighing the *Burley* factors, discussed above, the court concludes that no reasonable juror could consider Y.C. to be "similarly situated" to Mann.

First, Plaintiff has not offered sufficient evidence showing that he and Y.C. were "subject to the same decision makers."  *Id.* at *6.  Most significantly, the final decision makers were different:  Chief Taborn in Plaintiff's case, and Acting Police Chief Jeff Delinski in Y.C.'s case, Pl.'s Opp'n, Ex. 18 at 1.  Plaintiff, however, minimizes that difference and argues that Gaddis is the common thread.  *See* Pl.'s Opp'n at 21-23.  He relies on *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), in which the Supreme Court held that "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable" even if the ultimate decision maker did not harbor such animus.  *Id.* at 422 (footnotes omitted); *see* Pl.'s Opp'n at 21-23.  According to Plaintiff, Gaddis' involvement in both his disciplinary process and in Y.C.'s means that both were subject to the same decision makers.  Pl.'s Opp'n at 23.

The evidence offered by Plaintiff, however, does not establish that Gaddis was the "proximate cause" for Y.C.'s disciplinary action in the same way that he was for Plaintiff's.  The *only* proffered evidence of Gaddis' involvement in Y.C.'s case appears on the first page of Y.C.'s investigation report, which shows that it was sent "from" Sergeant Stephen Boehm "to" Acting Chief Jeff Delinski "thru" Gaddis and Lieutenant Doug Durham.  Pl.'s Opp'n, Ex. 18 at 1.  Gaddis appears to have reviewed and approved the memorandum because his initials appear next to his

name.  *Id.*  But such limited involvement in Y.C.'s case is a far cry from Gaddis' role in Plaintiff's disciplinary matter.  As to Plaintiff, Gaddis conducted the entire use-of-force investigation, drafted the investigation memorandum, and made the termination recommendation.  *See generally*, Mann Investigation Rep.  By contrast, in Y.C.'s case, all of those key actions were undertaken by someone else, Sergeant Stephen Boehm.  Pl.'s Opp'n, Ex. 18.  Boehm interviewed Y.C., the arrestee, and all of the relevant witnesses; he obtained and reviewed the available video of the arrest; he drafted the investigation memorandum; and he recommended the three-day suspension.  *Id.*  Unlike in Plaintiff's case, Gaddis' limited role in Y.C.'s matter cannot be viewed as the proximate cause of Y.C.'s discipline.  Mann and Y.C., therefore, are not similarly situated for that reason.

Second, Mann and Y.C. are not apt comparators because, even though both were found to have used excessive force, the sheer brutality of Mann's actions and the serious injuries they caused render his conduct starkly different from Y.C.'s.  The court has viewed the video of Dowtin's arrest.  *See generally*, Def.'s Mot., Ex., Videotape of 9/2/11 Arrest, ECF No. 34-8.  It captures Mann punching Dowtin in the rib cage more than ten times while Dowtin lies motionless on the ground, offering little resistance, except for refusing to remove his hands from underneath him.  Dowtin posed minimal, if any, physical threat to Mann.  *Id*.  Unable to free Dowtin's hands, Mann then picked up Dowtin to knee height and dropped him to the pavement, which Mann himself admitted doing multiple times.  *Id*.  All the while, Dowtin is screaming out in pain.  *Id*.  Dowtin suffered facial lacerations, rib fractures, and a lumbar spine fracture.  Def.'s Statement, ¶ 23; Pl.'s Statement, ¶ 23.  Y.C.'s conduct, though excessive, pales in comparison.  He twice kicked the arrestee while the arrestee was wrestling on the ground with other officers.  The arrestee

suffered relatively minor injuries—"a small abrasion on the bridge of [his] nose."  Pl.'s Opp'n,

Ex. 18 at 2-3.

Concededly, "[i]n order to be considered similarly situated, it is not necessary that the

comparators engaged in the exact same offense."  *Wheeler*, 2016 WL 556705, at *7.  But not all

acts of excessive force are created equal.  Surely, law enforcement agencies like MTPD, when

deciding proper discipline, can consider and weigh the degree and type of violence employed, the

justification (or lack therefore) for it, and the severity of the injuries.  That is precisely what MTPD

did in both Mann's and Y.C.'s cases.  That their acts are not of "comparable seriousness," *Wheeler*,

2016 WL 556705, at *7, especially after watching the video of Dowtin's arrest, cannot be seriously

disputed.

Finally, from a process standpoint, Mann and Y.C. likewise are not similarly situated.

MTPD arguably had greater discretion in disciplining Plaintiff—a high-ranking official who was

an at-will employee—than it did Y.C.  Moreover, Mann actually *benefitted* from his higher rank

because his conduct and proposed discipline was subjected to greater scrutiny.  As Taborn testified,

he wanted to leave "no stone unturned" before he authorized Mann's termination.  Taborn Dep. at

9:17-19.  He, therefore, submitted Mann's use of force for review to six of his deputies, *id.* at 8:9-

13, which he had not done before, *id.* at 9:1-5.  The six unanimously agreed that Mann's firing was

warranted.  *Id.* at 8:14-17.  That additional scrutiny would have substantially diluted, if not negated

altogether, any discriminatory animus held by Gaddis, if he had any at all.   That is yet another

reason why Mann is not similarly situated to Y.C.

**C.      Whether WMATA Discriminated Against Mann By Its Lack of a Consistent
          Disciplinary Policy**

Next, Plaintiff argues that summary judgment should be denied on the grounds that there

is a genuine dispute of material fact as to whether Defendant discriminated against Mann (1) by

failing to halt his administrative investigation pending the resolution of the criminal charges and (2) by refusing to reinstate him after he was acquitted at trial.  Plaintiff points out that WMATA has no written policy governing how a pending criminal investigation or charge impacts WMATA's administrative investigation against an employee, or whether the favorable resolution of the criminal process requires WMATA to revisit any disciplinary measures taken against the employee.  *See* Pl.'s Opp'n at 15.  Plaintiff claims this lack of a clear policy stands in contrast to the requirement that federal employers must reinstate terminated employees who are later acquitted of criminal charges.  *See id.* at 15-16 (citing *Payne v. U.S. Postal Serv.*, 69 M.S.P.R. 503, 508 (1996); *Pawn v. Dep't of Agric.*, No. SE-0752-96-0211-I-1, 1999 WL 356274 (M.S.P.B. May 25, 1999)).  According to Plaintiff, because of the lack of a clear policy, "[a] reasonable jury could very well conclude that WMATA's decision to terminate Lt. Mann prior to the outcome of the criminal case and its refusal to even consider the facts presented at the trial is evidence of pretext and, *indirectly* proves unlawful discrimination."  *Id.* at 16.

The court disagrees.  Even if Plaintiff is correct that Defendant lacks a clear policy as to how criminal proceedings impact internal discipline—an assertion that Defendant disputes, *see* Def.'s Mot., Ex., Aff. of Kevin Gaddis, ECF No. 34-10, ¶ 4—Plaintiff cites to no case which holds that the mere absence of such a policy can give rise to an inference of discrimination.  While it may be true that the absence of a written policy might make an employer more susceptible to a charge of discrimination, the mere absence of a policy cannot, standing alone, give rise to a reasonable inference of racial animus.

Nor was WMATA required to adopt any particular policy, as Plaintiff seems to suggest by citing the federal practice of reinstating employees whose criminal proceedings terminate in their favor.  Title VII does not require an employer to adopt any particular disciplinary workplace policy

or process.  It only requires an employer to apply its policies in a non-discriminatory manner.  *See*

*Burley*, 801 F.3d at 298 ("An employer's investigation that is so unsystematic and incomplete that

a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its

own discrimination can also permit a factfinder to find pretext.").

Plaintiff advances the additional argument that he was discriminated against because, in

other cases involving MTPD employees, Defendant halted its consideration of punishment until

the conclusion of the criminal proceedings, but did not do the same for him.  In support, he names

ten officers:  F.P. and D.B. (Ex. 13) A.L. (Ex. 28), M.F. (Ex. 29), R.B. (Ex. 36), T.H. (Ex. 32),

S.B. (Ex. 39), M.L.S. (Ex. 31), M.M. (Ex. 37), and M.S. (Ex. 38).  Pl.'s Opp'n at 16-17.  Of those

ten officers, six are African American and thus are not suitable comparators.  Def.'s Reply to

Opp'n, ECF No. 39, Ex., Aff. of Kevin Gaddis, ECF No. 39-1, at 2 (identifying officers R.B. (Ex.

36), T.H. (Ex. 32), S.B. (Ex. 39), M.L.S. (Ex. 31),[6] M.M. (Ex. 37), and M.S. (Ex. 38) as African

American).  The others—F.P., D.B., A.L., and M.F.—who are not African American, are not

similarly situated for other reasons.

In the case involving F.P. and D.B., an Assistant U.S. Attorney told MTPD that "her office

would be taking the lead in the investigation, and that all communication with the Officers

pertaining to this investigation should be directed to their counsel, and not to them directly."

Pl.'s Opp'n, Ex. 13, ECF No. 38-13, at 1.  By contrast, the State's Attorney in Mann's case advised

MTPD that it did not need to halt its disciplinary investigation and process.  Mann Investigation

Rep. at 7.  The other two non-African American officers, A.L. and M.F., are also distinguishable

from Mann as they were not charged with offenses comparable to his.  Both were charged with

driving under the influence while they were off duty.  Pl.'s Opp'n, Exs., ECF Nos. 38-28, 38-29.

---

[6] Plaintiff identifies this officer as "M.S.," but given that both Plaintiff and Defendant cite to Exhibit 31 in referencing this individual, the court concludes that they are referring to the same officer.

Mann, on the other hand, was investigated and charged with felony assault in the performance of his duties.  A.L. and M.F. therefore are not suitable comparators.

Mann also claims that there is a disputed question of fact as to whether WMATA has an informal practice, discriminatorily applied, of revisiting discipline after an MTPD member has been criminally exonerated.  In support, he cites the cases of Officers M.L.S. and T.H., who, according to Mann, were treated more favorably.  Pl.'s Opp'n at 19.  However, he cannot use these officers as comparators as they, like him, are African Americans.  Def.'s Reply to Opp'n, Aff. of Kevin Gaddis at 2.

### D.    Whether Gaddis' Investigation and Report Were Biased

Finally, the court turns to Plaintiff's contention that racial animus can be inferred because Gaddis' investigation report was biased and omitted key facts.  A plaintiff may establish pretext "with evidence that a factual determination underlying an adverse employment action is egregiously wrong, because if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so."  *Burley*, 801 F.3d at 296 (quoting *Fischbach*, 86 F.3d at 1183) (internal quotation marks omitted).  Furthermore, an "employer's investigation that is so unsystematic and incomplete that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up its own discrimination can also permit a factfinder to find pretext."  *Id.* at 297 (quoting *Mastro*, 447 F.3d at 855) (internal quotation marks omitted).

According to Plaintiff, Gaddis' report failed to state that when he arrived on the scene and started interviewing witnesses, Dowtin "attempted to sit up or stand up several times, was belligerently cursing at and threatening WMATA employees (including Mr. Mann) and removed his socks and shoes and [threw] them into the street."  Pl.'s Opp'n at 22.  This is significant, claims Plaintiff, because having observed Dowtin in such a state, he was led to believe that he was under

the influence of a controlled substance, "possibly PCP."  *Id.*  Plaintiff complains that Gaddis'

report omitted his belief that Dowtin was "possibly on PCP."  *Id.*  These omissions, "when

combined with the video that only showed part of the incident," Plaintiff argues, give rise to an

inference of a discriminatory motive for his termination.  *Id.* at 22-23.

The court disagrees.  The factual omissions that Mann cites are neither "too obvious to be

unintentional" nor do they render Gaddis' report so "egregiously wrong" as to given rise to an

inference of discriminatory motive.  For starters, Plaintiff never raised a specific concern with

Gaddis that Dowtin was on PCP.   Indeed, Mann nowhere mentioned PCP in his written

memorandum.  Pl.'s Opp'n, Ex. 5, ECF No. 38-5.  And, during his interview with Gaddis, all

Plaintiff said about whether Dowtin was under the influence of drugs or alcohol was that he

"seemed like he was on something."   Mann Interview at 9:3-4.   Moreover, contrary to Mann's

contention, Gaddis' investigative report did include reference to Dowtin throwing his shoes into

the street and cursing belligerently.  Although not expressly referenced in the report itself, the acts

were included in Mann's Statement, *see* ECF No. 38-5 at 2, and Mann's Interview, *see* ECF No.

38-4 at 9-10, both of which Gaddis attached to his report, *see* Mann Investigation Rep. at 8-9

(referencing Attachments #12 and #13 as Mann's Statement and Mann's Interview, respectively).

Thus, contrary to Mann's suggestion, Gaddis did not conceal, omit or distort the facts in the report

he prepared for Taborn.

To the extent that Mann argues that Gaddis' report was so "unsystematic and incomplete

that a factfinder could conclude that the employer sought, not to discover the truth, but to cover up

its own discrimination," *Burley*, 801 F.3d at 296, the court rejects that assertion.  Mann identifies

no investigatory step that Gaddis failed to take.  Nor could he, because Gaddis' investigation was

a thorough one.  Gaddis interviewed or obtained statements from numerous individuals who were

on the scene at the time of the incident, including Special Police Officer Nakisha Merritt and Metro bus operator Thomas McDonald, who were attacked by Dowtin; Frederick Cooper, a bystander who documented the arrest on his phone and voiced concerns about Mann's use of force; and Mann himself.  Gaddis also obtained statements from Sergeant Honick, Officer Jackson, and Lieutenant Kirkpatrick, who arrived on the scene shortly after Dowtin was placed in handcuffs.  Gaddis also interviewed Plaintiff and had a transcript prepared of his interview.  And, to gain an expert's opinion regarding Mann's use of force, Gaddis asked Captain Dawson to provide his opinion after providing him the video of the arrest and Mann's statement.  In short, no reasonable factfinder could find that Gaddis' investigation was so "incomplete and unfair," *Burley*, 801 F.3d at 297, as to constitute evidence of discrimination.  *Cf. Mastro*, 447 F.3d at 856-57 (denying summary judgment in a case in which the person conducting the investigation neglected to interview the plaintiff and turned a blind eye to key issues such as motive and credibility of the witnesses); *Salazar v. Washington Metro. Transit Auth.*, 401 F.3d 504, 509 (D.C. Cir. 2005) (denying summary judgment in a case in which, despite plaintiff's concerns that a certain individual and his appointees harbored discriminatory animus, that individual appointed the selection panel's chair and continued to be involved in the selection process).

## V.  CONCLUSION

For the foregoing reasons, the court grants Defendant's Motion for Summary Judgment. A separate Order accompanies this Memorandum Opinion.

Dated:  March 8, 2016

Amit P. Mehta
United States District Judge

27